The first case is agenda number one, case number 122327, People v. Buffer. Counsel, are you ready? You may proceed. May it please the Court, I am Assistant Attorney General Gopi Kashyap on behalf of the people of the State of Illinois. In Miller v. Alabama and Montgomery v. Louisiana, the Supreme Court declared that a particular penalty, lifetime imprisonment without possibility of parole, is prohibited under the Eighth Amendment for a particular class of offenders, juveniles who commit homicide but whose crimes do not reflect the transient immaturity of youth. This case presents the very narrow but recurring question of what constitutes lifetime imprisonment without possibility of parole for juvenile offenders when the sentence is a prison term denoted in a particular number of years rather than labeled life without parole, lifetime imprisonment without parole, or the like. It is only this harshest term of imprisonment that the Supreme Court addressed, examined, and prohibited in Miller. Thus, the question before the Court doesn't concern the broader but very important policy questions of what are the best or the ideal sentences for juveniles, or what reforms must be made to our prison system, or what post-release life should look like for an offender upon release. The legislature is tasked with addressing these important questions, and it is in the process of doing so. Here, the question is a narrow constitutional one concerning duration. Is the prison term so long that it is lifetime imprisonment without possibility of parole, and thus within Miller's categorical rule? In Reyes, this Court already held that for purposes of Miller v. Montgomery, a sentence is functionally equivalent to a life without parole when it is so long that it, in the words of Reyes, cannot be served in one lifetime, means the juvenile will die in prison, is unsurvivable, and means the juvenile most certainly will not live long enough to ever become eligible for release. The language that this Court used in Reyes merely echoes that that the Supreme Court used in Graham, Miller, and Montgomery when describing the unique characteristics of a life without parole sentence. In the words of the Supreme Court, a life without parole sentence is one that condemns a juvenile to die in prison, imprisons the juvenile until he dies, means the juvenile will remain in prison for the rest of his days, is the lengthiest possible incarceration, is a sentence that fails to provide some meaningful opportunity for the juvenile to obtain release before the end of his natural life. So at what point does a sentence violate Miller? Does it have to be unsurvivable to violate Miller? Yes, Your Honor. That's what the Court said in Reyes, is that the sentence must be unsurvivable. Now, whether a sentence is unsurvivable or not is a difficult question, and no one knows with certainty when juveniles will die or how long a prison term will necessarily mean that the juvenile will die. Should we limit it to a certain number of years, or should we do it on a case-by-case basis? We think we need a rule that applies broadly to the entire class of individuals. So the question in the Eighth Amendment is whether a particular penalty is prohibited for a particular class. So, for example, capital punishment is prohibited for juvenile offenders. Capital punishment is prohibited for the intellectually disabled. Grant says life without parole is prohibited for juveniles who did not commit homicide. But don't we have a statutory scheme that was prescribed for adults? And children certainly are not adults, so why should we use it when they commit offenses? Well, the statutory scheme applies to juveniles and adults, where the legislature has said that it applies to juveniles and adults. So the legislature, when Buffer was sentenced, had a statutory scheme that removed him from the juvenile court system where the maximum sentence was up to age 21, and placed the offender in the adult system and said we think that given the crime, murder, first-degree murder with a firearm, we think the same penalty should apply. So the juvenile sentencing scheme is used, is that correct? Yes. And the juvenile may be transferred either discretionarily or mandatorily based on the legislative decision. And so the legislature has carved out those juveniles that it believes should be treated like adults in the adult system. But the Supreme Court has said that juveniles are different from adults, is that correct? Yes. So shouldn't we have a sentencing scheme that's prescribed specifically for children? As a policy choice, Your Honor, that may be what the legislature chooses, and it has chosen. It has changed things after Miller as a policy matter. It has said that it has decreased the sentences for juveniles that are still in adult court and still treated like adults in adult court, but it has removed some of the more severe components of the adult system, like the mandatory firearm enhancement. So it's thought about juveniles, but the question here is not what legislative choices should be. I think in Patterson, the Court explained that. The transfer statutes were not unconstitutional and are not unconstitutional, even when you're moving juveniles to adult court. And the Court explained in Patterson that those questions are for the legislature to address, and the legislature did address them. Fewer juveniles are transferred mandatorily to adult court, and the sentences are different. But those are all policy questions, and the question here is a constitutional one about the dimensions of the Eighth Amendment as it currently stands. The counsel's regard to that, I mean, if you look at Miller and Montgomery, do they simply prohibit juveniles from being sentenced to mandatory life without parole, or do they really require those cases, not what the legislature says, but do those cases require that a juvenile be afforded a, quote, meaningful opportunity to reintegrate into society? Isn't that from those cases? No, Your Honor, it's not. The language of Graham is that the juvenile must have a meaningful opportunity to obtain release before the end of his natural life, or before the end of life. The cases discuss how a life without parole sentence deprives altogether a juvenile any opportunity to reenter society or to reintegrate into society or to be fulfilled in society. But the question in those cases was looking at and analyzing the nature of a life without parole sentence, which altogether prohibits all of those things. And so that is the question presented here, is does the sentence prohibit all of those things, deny altogether, say at the outset that regardless of whether you're rehabilitated, we will never let you out of prison. And that is what Miller and Montgomery and Graham are about. And here, and those are the words that Graham and Miller and Montgomery use in describing the life without parole sentence. So here we're talking about a 50-year term. In Patterson, the court said that a 36-year term. Is the constitutional question whether it's impossible to survive the sentence or whether it's statistically impossible or statistically unlikely that they would do so? The constitutional question is not defined precisely, Your Honor. We think the standard should not be whether it's impossible to survive it. We think the standard should be something more like is it probable that the juvenile will survive. Statistics are useful, but some of this is very much within the court's common understanding, common knowledge. And we as a community, as a society, know generally how long people live. And our beliefs are confirmed by statistics, actuarial tables. So one example is the retirement age. Retirement age is now 67 to 70, was 65 to 67, but it's 67 now. That reflects our society's belief, not that we expect people to die before 67, but that we expect people to live until 67 and then to live about 10, 15, 20 years after. That is the notion of the retirement age. Now, you have talked about you would like us to promulgate a bright line rule. Yes. Are you talking about a bright line rule in terms of years, 50 years, 53 years, 55 years, or is it something else? No, we would like a bright line rule in terms of years. A number of years. A number of years, because to say that it would be at age of release would lead to more disparities. A 14-year-old could get a greater sentence versus a 17-year-old, and we don't think that that is the proper way to draw a line. A number of years means the 14-year-old would spend the same amount as the 16-year-old or the 17-year-old, and so they might be released at different ages. But ultimately, the number of years in prison, the duration in prison, we think is what should govern, and we think that you should draw a line somewhere between 54 and 59 years. And the reason for that line is that, as the appellate court has seen, a sentence where the oldest juvenile is 17-year-old, given a 53-year sentence, is released at age 70. So a 53-year sentence means the oldest juvenile is released at age 70. So if you're releasing a person at age 70 or younger, we don't think that that is within a lifetime. We don't think that's a whole lifetime. But once you start getting into the 70s and you start approaching 75 or even 73, it's a closer question. We can't be as confident. The rates of survival decrease more appreciably. And so to be conservative and to ensure that we take in the juveniles that maybe are on the fence, we think a line that is within 54 to 59 years is reasonable. We think it comports with the retirement age. We think it comports with what we normally see. Most people seem to live past 75, but let's be conservative about it. Counsel, what's wrong? Mr. Miller, please. So to say that a 41-year sentence would be life, I mean we think that the legislature didn't intend to draw a line at 40 years and then preclude trial courts from considering specific factors. So you may have, that may warrant a greater sentence. So you may have a juvenile offender who, where the crime is murdering a police officer, but that also commits two or three additional crimes, or where the circumstances are particularly bad, but then he comes from a terrible background and there are lots of mitigating factors. And so in there he was influenced by peers. There could be a host of mitigating factors that would drive a trial court to say, well, we don't think that the minimum of 40 years is appropriate, but we don't think that the person's crimes reflect irreparable corruption, so life is not necessary. And so there should be a range between 41 and, you know, what is life. And we think a 10- to 15-year range is fine, or a 13- to 15-year range is fine and acceptable to give the trial courts discretion. And remember, we're talking about the Eighth Amendment. And the Eighth Amendment is putting a cap, and it's a constitutional cap, that no legislatures can get around at any point in time. And when the Eighth Amendment operates, it removes from the legislature the power to sentence for particular sentences. And Miller and Montgomery and Graham were very careful to limit the incursion on the legislative power. They said life without parole. They didn't even purport to analyze lengthy terms of years, as Justices Alito and Thomas pointed out in their dissents in Graham. Miller expressly says, we're talking about lifetime imprisonment without parole, and faulted the mandatory scheme for not providing the trial courts the opportunity to impose a, quote, lesser sentence, like life with parole or a lengthy term of years. Isn't there an irony here, though? Whether we make the cutoff 41 or 50 or 54 to 59, as you suggest, for establishing a life sentence, doesn't that create a situation where defendants who committed their crimes as juveniles who received a lesser sentence that falls underneath our new red line will be in a worse position than juveniles who were sentenced more harshly on the other side of the red line? No, Your Honor, because the person who gets the life without parole sentence, 54 years, there will have had to be a determination that his crimes reflect irreparable corruption and that it's necessary to provide that sentence. But a person who doesn't receive a life without parole sentence doesn't get life in prison. There is an opportunity for release. We are going to release the offender. We don't expect him to stay in prison for the rest of his days. And there is a distinction. Now, there's always going to be people that fall close to the line. This is the line-drawing issue. And the U.S. Supreme Court has tasked the court with figuring this out and deciding where is the line here. And any line is somewhat arbitrary because we don't have a specific study to look at. We don't have a specific – So the defendants who received the harsher sentence won't have the benefit of resentencing where the trial court now has discretion not to apply, for example, a firearm enhancement? Well, I don't – I don't – can you repeat your question just in case? I want to be sure I understand it. The resentencing court will have to look carefully at the Miller factors listed for mitigation, right? The resentencing court, should this case go back down? Is that going to – I'm going back to my question with respect to this red line and the number. Is that going to create some sort of equal protection or proportionate penalties clause problem? Because the person who fell underneath that red line is not going to get the same benefit of that. No, Your Honor. I think discretionary sentencing is discretionary sentencing, right? And so in Illinois, before Miller, we've always had a scheme that you account for the circumstances of the person and we look at their age. And so there was already in discretionary sentencing looking at the juvenile. Now, a person who is resentenced currently because he received a life without parole sentence will get the benefit of the new laws that have been applied. But they're not in that large of a difference of situation. The person before got an individualized sentencing hearing and the person after got an individualized sentencing hearing. It's just a consideration of the factors. But Miller itself doesn't stand for the proposition that every juvenile needs to have a hearing before a mandatory sentence is imposed or before any sentence is imposed to have a Miller hearing. It applies only to those category of offenders for whom life is the appropriate sentence or may be the appropriate sentence. And so for those offenders, there must be a Miller hearing or, as the legislature codified, now for any juvenile going forward, there must be a hearing. But the legislature is, of course, allowed to have a starting point and end point to their legislation. Other states like Iowa, for example, have determined under their own constitutions that any mandatory minimum sentence for a juvenile under the Iowa Constitution must include consideration of Miller factors. And they have done that not under the Eighth Amendment but their own interpretation of their own Constitution. And certainly that is an option to the extent our Constitution would allow for it. But that is not the issue here. The issue comes back to what the Eighth Amendment requires. And the Eighth Amendment requires only that a juvenile homicide offender not receive a life without parole sentence. And the question here is, what is a life without parole sentence? And we think that a 50-year term is not a life without parole sentence as measured by our everyday experiences, the retirement age, the results of a survey from the juvenile life without parolers that said they expect juveniles to live at least 55 years, and what our appellate court has said. And determining just as a matter of common sense that sentences of less than 54 years are not life without parole. We discussed drawing a line, but I do want to just emphasize a few points about why we think it is necessary to draw a line here. I looked at the court's PLA docket before coming here, and a review of the first 12 pages of the docket revealed that there are 44 cases pending presenting the de facto life question. And the sentences in those cases range from as low as 43 years to as high as over 60 years. And that's just what's pending in this court. There are certainly lots of cases pending in the lower courts. And so we just think it's very important to draw this clear constitutional line so that the parties can negotiate during plea bargaining. They can negotiate during postconviction process. The trial courts know what their boundaries are in sentencing and that the legislature knows what's constitutionally permissible as a cap. And so all of these reasons, we think, favor the court drawing the line now because it won't depend on the nature of the crime or the offender's characteristics. It really does depend on what this court believes is life without parole. And I'd like to finally just quickly touch on the remedy. To the extent that the court thinks that 50 years is de facto life without parole, we ask the court to draw the line there and say the sentence is under 50 years or not. And we ask the court to remand for second stage proceedings. We didn't argue about the merits of defendant sentencing hearing because we didn't think that the appellate court properly reached that issue on a first stage dismissal. We think when a defendant asserts that he's a juvenile in a postconviction petition and says that he received a life without parole sentence, if his sentence is life without parole and he asserts a Miller violation, that's enough to get him through the first stage. And then at the second stage, the parties, the defendant will be appointed counsel and the parties can argue about whether the hearing actually comports with Miller. The appellate court was merely reviewing the trial court's first stage dismissal. And so it didn't have the authority that the trial court did in terms of remedy. There were two options, either dismiss the case or move it to second stage. And so once the court said the 50 years was de facto life, that was enough and it should have remanded for second stage proceedings where the parties could explore whether the hearing complied. And so we just asked that we comport with the act, and this is the way the act is designed, and make sure that to the extent we remand this to the circuit court, that it still goes back for the normal postconviction process. To the extent the court finds that 50 years is not de facto life, we'd ask the court again to draw a line and we'd ask the court to remand to the appellate court as defendant requests for consideration of defendants' Illinois constitutional claim. But again, we just ask the court to remind the appellate court that to the extent defendants stated a gist of an Illinois constitutional claim, it should go back to the trial court for second stage proceedings and they can explore the merits of that claim at that time. If this court has no further questions at this time, I'll come back up during revote. Thank you, Your Honor. Thank you. Mr. Gehrke. Thank you, Your Honor. Your Honor, my name is Christopher Gehrke. I'm with the Office of the State Appellate Defender here on behalf of Demetri Buffer. May it please the Court. Your Honor, the United States Supreme Court in Graham-Miller Montgomery established a juvenile's significant rehabilitative potential and diminished culpability as a category of people is constitutionally significant at sentencing. And what those cases say is that if a juvenile's youth is not considered at their sentencing hearing, then they cannot receive a sentence that denies them, in the words of Graham, hope for fulfillment beyond prison walls. And the natural evolution of this Eighth Amendment jurisprudence, as evidenced by state high courts around the country, establishes that a sentencing judge cannot incarcerate a juvenile for a half century, 50 years, after a hearing where his youth was not properly considered. And therefore, Your Honor, we respectfully request that this Court affirm the lower court below. Now, the State's argument is that Miller and the considerations of Miller, the protections of Miller, which are that a juvenile's youth is considered at sentencing, applies exclusively to sentences that, in the State's words, guarantee that the juvenile will die in prison and nothing less. But none of those cases, none of the U.S. Supreme Court's cases, nor even this Court's case law necessarily limits the rationale and the goals of Miller to sentences that guarantee death in prison. What Graham and Miller said about the problem with life sentences, about the reason life sentences implicate the Eighth Amendment, is because they, quote, deny hope of restoration. They deny a chance for reconciliation with society. They deny a chance for fulfillment outside of prison walls. They deny a chance to achieve the rehabilitative ideal. That language suggests something more than just dying in prison. It suggests that something more than just as long as a juvenile steps outside of prison before he dies, the Eighth Amendment isn't implicated. Now, the State suggests, Your Honors, that there's some sort of sacrosanct notion. What we're talking about here is what is the functional equivalent of life without parole within this context of juvenile sentencing. And the State suggests that this is a concrete, decided rule, that it has to mean guaranteed death. But that's not how the law has evolved throughout the country. And even in this Court, Your Honors, this Court specifically held in Holman in 2017 that Miller's analysis, quote, is neither crime nor sentence specific. It also held, Your Honors, that Miller contains language that is significantly broader than its foreholding. And even in Reyes, Your Honors, this Court's only opportunity so far to deal with what a functional equivalent of a life sentence is when it found that a mandatory 97-year sentence was unconstitutional, it arrived at the conclusion that you could have, that a functional equivalent of life sentence would apply to a Miller claim by citing two other State high courts. And in the very cases this Court relied on, either at the time or since, have recognized that sentences that don't necessarily guarantee death implicate Miller. We have the Iowa Supreme Court, which opposing counsel mentioned, found that under its own Constitution, in light of the principles of Miller, a 52-year sentence was unconstitutional. This Court cited extensively from Bear Claw, which found that parole eligibility after 45 years was unconstitutional. This Court also cited to, I think it was called Caballero, the California Supreme Court case. Just last year, the California Supreme Court found that a 50-year parole eligibility was unconstitutional. Counsel, I understand that you represent your client and you've indicated decide this case. Obviously, this is an opportunity for us to establish a bright line rule that will affect other cases. I think right now we're saying 89 is too old and 36 is, there were 36 and 89, we have two cases on either end of the spectrum. You heard my question of opposing counsel with respect to the legislation going forward and some of the statutes were, we could glean that perhaps if we extrapolate that 40 years is the number that the legislature may have been inclined to, if they were in our position, say 40 years is it, what's wrong with that analysis, if anything? With the analysis of not, I'm sorry, go ahead. Well, go ahead. The same question to her. With extrapolating on, for example, the murder of the police officer and 40 years without going into the Miller factors, what's wrong with that analysis? I don't necessarily think there's something wrong with that analysis, your honors. I mean, obviously the legislature in 2016, after Miller Graham and possibly Montgomery, enacted new juvenile sentencing laws and they said basically for certain serious homicide offenses, such as killing a police officer, that in the minimum sentence is 40. But in that same statute, they require the consideration of youth, certain youthful factors that this court found in Holman comply with Miller. So they basically indicated that this is the longest sentence we're giving juveniles without before you actually consider their youth. So I think that would be appropriate. But just to be clear, we are not asking this court to draw a line. This court should only decide the case in front of it. And that's because, well, first of all, I'm unaware of any other case in any state, supreme or appellate court that has actually drawn a line other than deciding the case in front of them. And in of the cases, in of the other state supreme court cases that have actually decided whether they should draw a line, they decided that they should not draw a line. I'll give you two examples of Casiano in the Connecticut Supreme Court and Contreras in the California Supreme Court. Both courts dealt with the question of whether they should draw a line. And by the way, both courts found that a determinate sentence and or parole eligibility 50 years was unconstitutional. And they declined to draw a line below that because they thought it was more appropriate for the legislature. And here the legislature has already, for the most part, fixed the problem. For the same offense that my client has been convicted of, his minimum sentence has dropped from 45 years to 20 years because there's no mandatory firearm add-ons anymore for juveniles. They can be applied discretionarily but not necessarily mandatory. And in addition, as this court recognized in Holman, a juvenile's youth, for any offense, homicide or any other offense, their youth has to be considered. So now any juvenile who receives a long sentence will have their youth properly considered by a court. And in addition, courts, you know, this court can, there's a possibility that, you know, the Illinois legislature might institute some sort of parole system for juvenile offenders. You know, after 20 years or 25 years, perhaps, you know, a juvenile offender would at that point have the opportunity, you know, for release, which would sort of negate, you know, this problem. And I think, you know, I hope you don't ask about the details of it, Your Honor, but I think there's something kicking around in the legislature right now about that. But there are cases in the pipeline, and I'm saying we'd have to say, and you indicated in your response to the question, that, you know, those determinations are made for the legislature. That's why I keep saying extrapolating from that statute and indicating perhaps the legislature has already commented or chimed in on what would be the maximum number of years assessed without going into the Miller bill. And I think that's a fair characterization of what the Illinois legislature might have done and say that, you know, we're, in light of Miller, you know, they took the principles of Miller, created a new statute, and this statute said the maximum amount of time we're going to give, you know, juveniles for very serious murder offenses without considering their youth is 40 years. Are you saying, then, that there is a number that would comply with the Eighth Amendment as to juveniles? Or are you saying that in every, as far as juveniles are concerned, there really should be no mandatory minimum, that it's a case-by-case assessment? We are not asking the courts to go so far as Iowa Supreme Court as to, you know, negate all mandatory minimums, not in this case, although we would, of course, welcome that decision. What we're saying, and just to be clear, we're not, we don't accept the states, as I was arguing before, we don't accept the states' standard, the idea that functional equivalent of life means, you know, the actuarial equivalent of life. Other states' high courts have explicitly rejected that notion. The California Supreme Court said that Miller's application is, quote, not limited to whether a term of years is actuarially equivalent to a life sentence. The Connecticut Supreme Court has said that, you know, a sentence need not continue until the literal end of one's life for Miller's protections to apply. And what those state high courts instead apply is the language from Graham and Miller, which is that a juvenile, which is that a juvenile offender must receive a meaningful opportunity for release based on demonstrated maturity and rehabilitation. And what other courts have interpreted that to mean is not merely that they can step outside of prison before they die, but that they actually have a chance to reenter society, a realistic chance of becoming a normal person again. What does that mean? It's a great question, Your Honor, but I think we can look to the... It can mean a lot of things. It can, sure, yeah. It can mean old enough to still get a job or young enough to still get a job or young enough to still have children and, you know, there's a whole lot of things it could mean, right? It's true, Your Honor, but I think what it could... What I think at a baseline it means is that someone, I think, you know, the likelihood or possibility, at least, the realistic possibility of getting a job would be part of that because, you know, someone being able to take care of themselves and live out their final years of life with some kind of dignity, I think, would be important. But we can look to the principles laid out in the U.S. Supreme Court's own language. You know, the U.S. Supreme Court's the one that gave us that language, Your Honor, so we just kind of have to apply it. And what the U.S. Supreme Court has said, again, a sentence, you know, can't be imposed without considering youth if it denies a hope of restoration, a chance for reconciliation with society, fulfillment beyond prison walls, a chance to achieve the rehabilitative ideal. I think that, you know, courts apply sort of relatively ambiguous principles like that all the time. We always have to decide, you know, what a reasonable person would do in a certain situation. So I think that while it's not necessarily, you know, 100 percent clear so far where it draws the line, I think it's something that courts can apply on a case-by-case basis and determine whether or not a particular sentence meets that standard. And courts around the country have applied that exact analysis and determined that a sentence of exactly 50 years or close to 50 years is unconstitutional. Are you asking us to, in this case, say that 50 years is equivalent to life? So we would be establishing at least 50 years. Correct, Your Honor. Correct. We're asking this court to decide that a 50-year sentence is the functional equivalent of life because it denies a juvenile offender a meaningful opportunity to actually, you know, not only be released from prison but to be able to reintegrate in society, a realistic opportunity of that. But you're not arguing for a right-line test lower than that is? Correct. We're not asking this court to extend its decision beyond what's before it in this particular case. But wouldn't this then stand for the proposition that 50 years is too much? We don't know if something less is? Yes. Yes, I would, Your Honor. Absolutely. And again, as I was saying, other state high courts have found that 50 years is too long to give a juvenile without consideration of their youth. The high courts of California, Maryland, Connecticut, Wyoming, Iowa under their state constitution, Missouri, Florida, and New Jersey dealt with a 55-year sentence which is a little bit longer. But all those other states I said found a sentence of 50 years or less, as low as 45 years, to be unconstitutional under the Eighth Amendment. And they did so based on this notion that, you know, a juvenile offender must have a meaningful opportunity to reintegrate back into society. And we think that that standard more appropriately balances the retributive and rehabilitative goals when applied to juveniles. This court I'm sure is well aware, the U.S. Supreme Court case law and this court's case law makes it very clear that the cause for retribution for a juvenile offender is relatively low because they have a diminished culpability. Because their brains aren't developed, they're easily influenced. Whereas the cause for rehabilitation is very high compared to adults because, again, their brains are still developing and they tend to age out of criminal behavior. What the state's standard is, the state's, you know, harsh survivability guaranteed death life expectancy standard is, its goal is to extract the maximum amount of retribution and punishment from a juvenile without any consideration of their youth having, without them having ever had any consideration of their youth. And at least in the situation with the meaningful opportunity for release, if a juvenile's youth is not considered at their sentencing hearing, their rehabilitative potential is still given some effect because they can then rejoin society. Whereas if the standard is life expectancy, you know, that will sweep in juveniles who will never have a chance to be released. So if we accept your argument and say that in this case 50 years is too much, we would have to be basing that on life expectancy tables, mortality tables, that type of thing, would we not? To a degree, but not to the degree that I think the state's argument requires. Obviously, I think the state's argument. Whereas if we establish 40 years, as Justice Thomas is asking about, extrapolating from the statute, we would have that as a basis for doing it. Sure, Your Honor. Separately from the life expectancy. Correct. Absolutely, Your Honor. That's absolutely right. And, too, life expectancy matters for the purposes of this meaningful opportunity for release standard in the way that sort of the state's argument, we generally know how long people live. But the state's argument isn't limited to generally what we know. The state's argument is guaranteed death in prison. And that's the standard they're saying that Miller applies to. And that's a problem. Even if we knew, even if we could pick out a life expectancy number, a life expectancy is just the, it's an average. It's a mathematical average. The courts have recognized this. That means that approximately half the population will not reach a certain number. So the closer your sentence gets to the life expectancy, even if it's lower than the life expectancy, you may have no better than a coin flip chance of actually surviving your sentence at all. And yet that's what the state says gives you a meaningful opportunity for release. And it doesn't. Now, in addition to, and that's. Although you're not asking for a bright line rule, your argument would not change much if your client, it was a 45-year sentence, 44-year sentence. Probably not, Your Honor, although there may be lesser authority supporting my position. As the Maryland Supreme Court just recognized in August, I think, they recognized in their survey of the law of other state high courts that there's sort of a 50-year threshold, that there's a number of states that have found that, you know, at least a sentence of 50 years is unconstitutional. A few states, like I think Wyoming, I think Florida, and State v. Kelsey, and a few others have found that sentences of 45 years, even as low as 45 years, are still unconstitutional. But I think that, you know, it's very clear if you look at, you know, the state high courts that I've cited, that a sentence of 50 years has been found to be unconstitutional under the Eighth Amendment. And I also ask this Court to look to, you know, legislation around the country. In addition to our own state, which has, as I explained, gotten rid of mandatory minimum firearms, mandatory minimums for juveniles, they have required the consideration of youth, which this Court has held complies with Miller, such that my client, were he sentenced today, his minimum sentence would be 20 years, not 45, as youth would be required to be considered as mitigating instead of aggravating, as it was in his sentencing hearing. So if we look to this Court's legislation. We're in a little bit of a strange position, aren't we, based on your argument that, you know, this time we say 50 years, 50 year sentence is too long. Forty-five cases in the pipeline, I think I heard, coming forward. You indicated that it's in the purview of the legislature to determine any bright line. And yet, by the time we get through the cases, what's the difference? I mean, we're listening to all the factors. We're taking into account tables, life expectancy tables and whatnot. And we're just reducing until we get to the point where I assume 36-year sentence was not enough for us. But until we get to that 36 mark, we're serving in the role of legislature, right? Unless we do some, at least we have the opportunity here again, I know I'm beating a dead horse, to extrapolate from something the legislature has already done. Correct, Your Honor. I think, I mean, obviously any decision this Court makes is going to be, you know, is going to set a bright line rule. You know, other cases may. But I think that when it does so, Your Honor, again, it gives the legislatures at least a standard to apply when determining sentences below 50 years. You know, with this Court, you know, finds that a sentence that doesn't afford a meaningful opportunity for release, the lower courts, you know, you need kickbacks. Those are the cases of the lower courts. They're going to have to decide that. And in the meantime, we also have, as I said, without choosing a bright line rule, we can wait. You know, this Court's decision can encourage the legislature to, you know, create a system of juvenile parole, for example. That would sort of obviate this problem, you know, for everyone. Any person who has a long sentence now, if they have an opportunity for release, a real opportunity for release after 20 or 30 years or something like that, that would solve the problem. But, as Your Honor says, this Court can also look to, you know, what the legislature has done and say that, you know, the legislature at the very least has said a sentence of 40 years, that's the maximum sentence we're going to give a juvenile offender before you actually have to consider their youth. And this Court could draw the line that way as well. You don't think there's any tension, then? You don't think there's any tension between doing that and being in compliance with seeing a meaningful opportunity for release? I don't think so, Your Honor. I think, I mean, at the very least, our argument, obviously, is that a 50-year sentence does not provide that opportunity. And so if a, and again, a meaningful opportunity for release or chance to, you know, rejoin society, I think, you know, a sentence of, you know, 40 years, you know, where someone is, you know, released in their mid-50s, I think, obviously gives them a much better chance to, you know, it's farther away from the end of their lifespan, however, you know, one wants to categorize that. And it gives them a longer, a more realistic chance of actually, like, getting a job and becoming a normal member of society again, as opposed to, you know, a sentence of 50 years, which courts have recognized comes close to the end of a person's lifespan. You know, the state acts as though 50 years, it's, you know, there's no question, everybody knows everyone's going to survive a 50-year sentence. But again, my client, you know, even by the state's own metric, based on my client's, you know, race, my client's life expectancy is 73, and he's going to be released at age 66. So he's going to be released very close to the end of his lifespan. And as I said, if we're looking only at life expectancy, which is kind of what the state argument demands, that's an average. My client has, you know, maybe a 50-50 shot, or even if it's not quite that high, it's a strong possibility he will never be released from prison. So does that actually give a meaningful opportunity, even just to obtain release? I don't think it does. And it's best case scenario then, let's say he will survive. Then he's going to be released from prison, which he entered as a teenager, when he's 66 years old, approaching, you know, 70 years old. He won't have a job. He won't have any money. He won't have any prospects of getting a job as a, you know, a person of 66 with no job history, with a criminal record. You know, he's at an age where, as counsel pointed out, the law itself recognizes that you shouldn't necessarily even be working. You should be retired at that point because he'll be age qualified for Social Security, even though he can't actually get Social Security because he's been in prison for 50 years. So basically, the best case scenario for my client in this case, which is what we're asking this court to decide, is even if he survives his sentence, he's basically, you know, doomed to live the last few years of his life homeless, impoverished. You know, his family and friends are likely, you know, estranged. That does not give effect to Graham and Miller's recognition that a sentence, if imposed without consideration of youth, has to afford, you know, hope of restoration, reconciliation with society, fulfillment beyond prison walls. So, oh, I see my time is up, Your Honors. I'm very sorry. For those reasons, Your Honors, we respectfully request that this court find that my client's 50-year sentence was unconstitutional and affirm the lower court. Thank you. Thank you, Mr. Yerke. Ms. Kasha, reply. I'd like to start with what the question before the court is. And the question before the court is is not whether to expand the Eighth Amendment. It's to decide what Miller means and to whom it applies. And Miller, by its terms, applies to lifetime imprisonment without parole. And the court is tasked with determining what sentence is the same as that sentence. And so, counsel cited multiple state courts and their decisions. I'll start with California. California, right at the outset, in the majority decision, stated that 50 years is not de facto life without parole. It went on to analyze a 50-year sentence and determine that it does fall within Miller and that they believe that it should be prohibited like Miller. But it recognized at the outset that it's not the same as a life without parole sentence. And I urge this court to look at all of the opinions in these state high court cases because all of them, with the exception of Wyoming, have dissents. And they have very good dissents that go through and explain what the difference is, what's the question here. And the Eighth Amendment is saying, under the Supreme Court precedent, that we are banning lifetime imprisonment without parole. As for this number of state high courts that counsel cites, Florida did not hold that 45 years is life without parole. Florida's evolution after Graham v. Florida has been interesting because there's legislative choices that have been made and then there are Florida Supreme Court decisions that have been enacted. There's a group of offenders under the Florida legislative scheme that fall within a period of time who get the benefit of the legislative enactment, which allows them an opportunity for parole if their sentence is greater than 20 years. And so Kelsey is a case that sort of talks about that group of offenders. Then there are cases post-Kelsey, as the Florida District Court of Appeal has been addressing, where the offenders don't fall within that very narrow line. And, in fact, the Florida Supreme Court has said multiple times now that when they're analyzing a sentence post-Graham and the person falls within the legislative line, it doesn't matter whether the sentence is or is not de facto life. And so, but in the later case, which is cited in our brief, the Florida District Court summarizes all of that and explains that a 50-year sentence is not life without parole. And so Florida is not a state that falls within the grouping that has found 50 years to be life. California is with the dissent, and we urge the court to look at the dissent, and California recognizes that 50 years is not de facto life. Connecticut is another case. And then beyond that, we have Missouri. Missouri didn't find that a life sentence with parole at 50 years is de facto life. What Missouri said was that the only two harshest sentences in Missouri are capital sentence and a life sentence with parole at 50 years. And so the Missouri court's reasoning was, when we find the harshest sentence in our state, it's life with parole at 50 years, then we're going to apply more to it without worrying about it because it is the harshest term of imprisonment available in Missouri. And so my point is to say that there are about five to seven courts that have said that 50 years is life without parole, but all under various or akin to life without parole, but all under various reasons. But we have about 11 to 13 other states that do not apply the Eighth Amendment to 50-year sentences. We have the Eleventh Circuit, a federal court, that says that a 50-year sentence is not de facto life without parole. And so it isn't as clear as counsel would make it that all the courts are holding that 50 years is life. There is a split, and the split is not just between jurisdictions. It is within jurisdictions, and I urge the court to look at the dissenting opinions. Some of them are very well-reasoned, and this court will choose what it believes is necessary under the Eighth Amendment. Going back to Justice Thomas's question about the legislature and what we can extrapolate from the legislative decision, before the legislative decision, the mandatory sentence for a murder of a police officer was life without parole. After Miller, the legislature took a look at our scheme and removed the mandatory enhancements for juveniles and then decided that for that very serious offense and for some others, the mandatory minimum sentence should remain high 40 years. But I don't think that the legislature meant that that was life without parole. I think it meant that it was less than life without parole and that there would still be room for trial courts to sentence above that to the extent that the circumstances required it. But, of course, the legislature doesn't know what the cap is. The legislature doesn't have a constitutional rule only because it's an Eighth Amendment rule, and all that the U.S. Supreme Court has told us is that life without parole is non-constitutional. And we have Reyes that says 89 years is life without parole. And so the legislature is working without actually knowing what the constitutional permissible line is. And that's the reason that we asked the court to address this. Perhaps the legislature believes 40 years is it, and they can certainly tell us that, or perhaps it believes 50 years, or perhaps it believes 55 years. They know that the cap for first-degree murder with a firearm for a juvenile is still, let's see, 60 plus 25 is still 85 years. That's the longest sentence that a juvenile could get under our current legislative scheme. And that would be at the discretion of the trial judge. So there's still a number of years that we don't have an answer to, and the legislature hasn't provided us an answer to. And I emphasize that counsel's correct. The legislature is working on this. The status of the current bill is that it's passed both houses. It's a parole bill. It doesn't apply retroactively, and so it wouldn't apply to defendant. And so it's still necessary at this point, and the governor hasn't signed it yet. And so it's still necessary at this point that we don't know. And if parole is enacted and it's retroactive, then defendant would certainly get the benefit of the bill. But that hasn't happened yet. This court is tasked with the constitutional question, not the legislature. The U.S. Supreme Court is tasked with determining what violates the Eighth Amendment, and it has said that lifetime imprisonment without parole violates the Eighth Amendment. Did you mention what the year range was for the cases in the pipeline? So my review on this court's docket is the lowest term is 43 years, and the highest is well past 60. I mean, I think it's 78 or something. I think it might be NIETA, which is at 78. How many cases? At least 44. I'll be honest, I stopped counting after the first 12 pages. It felt like that was enough. So there are many, and I know of cases in the circuit court, because I've been in communications with state's attorney's offices that have asked, when will buffer be released? So I urge the court to give us some finality. Give us an answer. Everyone is waiting. And, unfortunately, the U.S. Supreme Court has tasked this court with doing this. And so we asked the court to draw a line. We think the standard is what Miller says, is it lifetime imprisonment without parole? And we think 50 years is not that sentence, but we think somewhere between 54 and 59 is that, because as the New Jersey Supreme Court said, once you're releasing an offender in their 70s or 80s, it starts to look more like life without parole. And if you're not releasing the juvenile in their 70s or 80s, then it's not life without parole. So that's what we would ask the court to do. If the court has no further questions, we ask the court to reverse the judgment of the appellate court. Thank you. Case number 122327, People v. Buffer, will be taken under advisement as agenda number one. Ms. Koschek, Mr. Gehrke, we thank you for your arguments this morning, and you are excused.